UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

      v.                                                **DECISION AND ORDER**
                                                            19-CR-199-RJA

KEONNA DAVIS,

                        Defendant.

---

Defendant Keonna Davis has filed a counseled motion (Dkt. Nos. 95, 97, 98, 99) for a sentence reduction under 18 U.S.C. § 3582(c)(1)(A)(i). The Government filed a response in opposition (Dkt. Nos. 106, 107), and Defendant submitted reply papers (Dkt. No. 110). For the following reasons, Defendant's motion for a sentence reduction under the compassionate release statute is DENIED.

## BACKGROUND

Defendant was charged in a 33-count Indictment (Dkt. No. 1), returned September 25, 2019, with sixteen counts of wire fraud, in violation of 18 U.S.C. §§ 1343 and 1349; seven counts of mail fraud, in violation of 18 U.S.C. § 1341; and ten counts of aggravated identity theft, in violation of 18 U.S.C. § 1028A(a)(1). On December 14, 2020, Defendant entered guilty pleas to Counts 6 (wire fraud) and 27 (aggravated identity theft). On August 31, 2021, the Court sentenced Defendant to a term of imprisonment of 64 months on Count 6 and 24 months on Count 27 to run

consecutive to Count 6, for an aggregate of 88 months.  The Court also imposed an aggregate 3 years' supervised release, and restitution in the amount of $46,197.83.

Regarding Defendant's offense conduct, in 2017, she had been employed as a Disaster Recovery Specialist for the United States Small Business Administration (SBA), fielding applications from survivors of federally declared disasters—such as hurricanes—for disaster relief loans.  These low-interest loans were for expenses not covered by either insurance or funding from the Federal Emergency Management Agency (FEMA).

In August 2017, victim G.O. applied for a disaster relief loan from the SBA.  Defendant then abused her role at the SBA, in utilizing G.O.'s personally identifying information (PII) to apply for a $4,900 loan to lease a French bulldog.  She executed similar schemes against more than ten victims who applied for disaster relief loans, obtaining loans and purchasing goods and services with an intended loss totaling $285,430.29.  Other products/services Defendant sought to gain or gained included credit cards, cell phones, furniture, appliances, diamond jewelry, and a Land Rover.

Defendant used sophisticated means to carry out her schemes.  To avoid transferring currency directly to her name, Defendant used PayPal as a conduit to transfer currency out of victims' accounts into accounts under fictitious business names she controlled.  Defendant also maintained control over victims' email addresses, and she had their cellular telephone numbers transferred to her own number to falsely portray herself as the victims and prevent them from being notified of potential fraud.  She further placed mail holds on victims' accounts and used informed delivery accounts to monitor the mail each victim was receiving and to

prevent them from suspecting fraud. Defendant also requested duplicate driver's licenses of four victims to display her photograph on, along with the victims' PII.

At sentencing, Defendant asked for a significant downward variance to no more than an aggregate 30 months' incarceration, based on several factors including her serious medical conditions, *i.e.*, Stage V renal failure, congestive heart failure, and chronic hypertension. Defendant also mentioned in her sentencing submissions that a medical professional had recently recommended that she consider a kidney transplant, but she had been unsuccessful in obtaining a match and was concerned that incarceration would lessen her chances of finding a donor. The Government asked for 102 months' imprisonment, the high end of the range, in large part due to the severity of Defendant's offense conduct and the impact her conduct had on the victims.

The Court imposed an 88-month sentence at the low end of the aggregate range of 87 to 102 months (the advisory range on Count 6 was 63 to 78 months, and 24 months was the statutorily required sentence on Count 27), rather than varying downward as requested by Defendant. However, the Court granted Defendant's request for voluntary surrender and recommended that Defendant be housed in a Federal Bureau of Prisons (BOP) facility equipped to handle her medical issues.

Defendant commenced service of her sentence on January 18, 2022,[1] and she is currently housed at Federal Medical Center (FMC) Carswell, with a projected

---

[1] An arrest warrant was issued by the Court upon notification that Defendant had failed to surrender to the BOP, and the warrant was returned executed on January 18, 2022. The Court then directed the U.S. Marshals Service via Text Order to transport Defendant to the BOP for service of her sentence.

release date of May 13, 2027.[2] Defendant, who is now 37 years old, asks that the Court reduce her sentence to time served, with any restrictions on her term of supervised release "so long as those restrictions permit her to obtain all necessary medical treatments." Defendant also indicates that the Court could immediately release her from custody and extend her three-year term of supervised release to the length of her unserved term of imprisonment.

The Court finds it prudent to note that on October 24, 2023, approximately two years after Defendant's sentencing, she was again federally indicted, in 23-CR-123-RJA-HKS.[3] Defendant is currently charged with twelve counts of wire fraud and attempted wire fraud, in violation of 18 U.S.C. §§ 1343 and 1349; and one count of failure to surrender for service of sentence, in violation of 18 U.S.C. §§ 3146(a)(2) and 3146(b)(1)(A)(i). With respect to wire fraud, it is alleged that from April 2020 until May 2021 (after Defendant was indicted in the instant case), she submitted fraudulent loan applications to the SBA, seeking loan approvals under the Economic Injury Disaster Loan Program and Paycheck Protection Program. It is alleged that, while the SBA did not approve all her applications, it did approve a total of approximately $113,200 in loans. The parties are awaiting the outcome of the instant motion before proceeding with motion practice in 23-CR-123.

---

[2] *See Inmate Locator*, Register Number: 28904-055, Federal Bureau of Prisons, https://www.bop.gov/inmateloc/ (last visited Jan. 23, 2025).

[3] The Government referenced the investigation into this alleged conduct it its sentencing submission in August 2021.

**DISCUSSION**

It is undisputed that Defendant has satisfied the compassionate release statute's administrative exhaustion requirement. *See* Dkt. Nos. 95-1; 106, 107; *see also United States v. Saladino*, 7 F.4th 120, 123 (2d Cir. 2021). Thus, the Court will assess Defendant's motion on the merits.

Under the compassionate release statute, a district court may "reduce the term of imprisonment" and may "impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment[.]" 18 U.S.C. § 3582(c)(1)(A). A district court is permitted to reduce a term of imprisonment if, "after considering the factors set forth in section 3553(a) to the extent that they are applicable, it finds that extraordinary and compelling reasons warrant such a reduction…and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(i) (alterations omitted). It is a defendant's burden to show that he or she is entitled to a sentence reduction. *See United States v. Jones*, 17 F.4th 371, 375 (2d Cir. 2021) (per curiam). "A district court has broad discretion when considering a motion for compassionate release." *United States v. Halvon*, 26 F.4th 566, 569 (2d Cir. 2022) (per curiam).

**I.    Extraordinary and Compelling Circumstances**

Defendant argues that her medical conditions, which she asserts have substantially worsened since she was sentenced, warrant her immediate release from custody.

Before she was sentenced, Defendant reported to Probation that she was diagnosed with renal failure and hypertension at the age of 15, and she was on the kidney transplant list because her condition was continuously deteriorating. According to her medical records reviewed by Probation, as of April 2020, at age 32, Defendant was diagnosed with Chronic Kidney Disease, Stage V ("Stage V CKD"), and that year she was also diagnosed with Congestive Heart Failure. In December 2020, Defendant underwent a pretransplant kidney evaluation with a medical doctor, who noted Defendant's eGFR was approximately 12 mL/min, and she was not on hemodialysis at the time.[4] Defendant was informed of the potential benefits and risks of a kidney transplant. It was unclear to the doctor whether Defendant had any potential live donors, and Defendant was informed of other options for long-term care, *i.e.*, a deceased donor transplant or long-term hemodialysis. The doctor deemed Defendant an overall "acceptable candidate" for a kidney transplant. Dkt. No. 87 (revised presentence investigation report), ¶¶ 89-90, 94.

Defendant argues her formal diagnosis with End Stage Renal Disease ("ESRD") (*see* Dkt. No. 99, p. 119) and dependence on hemodialysis in the BOP,

---

[4] "Glomeruli are tiny filters in your kidneys that help remove toxins (waste) from your blood. Estimated glomerular filtration rate (eGFR) measures how much blood these filters clean every minute based on your body size… Healthcare providers measure eGFR in milliliters of cleansed blood per minute per body surface (a measurement that reads mL/min/1.73m2) …Stage 5 (eGFR below 15) is a sign of kidney failure. It means you have less than 15% kidney function. This stage is the most serious and can be life-threatening. You will need dialysis (a machine to filter your blood) or a kidney transplant." *Health Library: Diagnostics & Testing: Estimated Glomerular Filtration Rate (eGFR)*, Cleveland Clinic, https://my.clevelandclinic.org/health/diagnostics/21593-estimated-glomerular-filtration-rate-egfr (last visited Jan. 23, 2025).

support her position that her medical conditions have materially changed since she was sentenced. The Court disagrees. It appears ESRD is functionally synonymous with Stage V CKD—the latter which, as mentioned above, Defendant was diagnosed with before she was sentenced—and that hemodialysis or a transplant are the only treatments for individuals with this condition, meaning Defendant was faced with these two options upon her earlier diagnosis with Stage V CKD.[5]

Even so, by simple comparison of Defendant's eGFRs, Defendant's ESRD has certainly worsened since December 2020. During monthly blood draws from June 2023 to April 2024, Defendant's eGFR ranged from 2 to 4 mL/min, as compared to 12 mL/min.[6]  *See* Dkt. No. 99, pp. 25, 173, 244, 275, 300, 334, 665, 706, 735, 746, 755, 772, 799.

It also looks like Defendant has developed other medical issues while at FMC Carswell, which may be related to her ESRD, including: a diagnosis of secondary

---

[5] "Stage 5 CKD means you have kidney failure (*also known as end-stage kidney disease or ESKD*). People with stage 5 CKD have an estimated glomerular filtration rate (eGFR) less than 15 for 3 months or more (confirmed with repeat testing to make sure you don't have acute kidney injury) or they are on dialysis. Another way to think about these numbers is your kidneys are working less than 15% of what the average two healthy kidneys in a young person can do. For this reason, people with stage 5 CKD will need dialysis or a kidney transplant to survive… Dialysis and kidney transplant are the only two treatments for people with kidney failure." *Kidney Topics: Stage 5 Chronic Kidney Disease (CKD)*, National Kidney Foundation, https://www.kidney.org/kidney-topics/stage-5-chronic-kidney-disease-ckd (last visited Jan. 23, 2025) (emphasis added); *see also* Dkt. No. 99, p. 591 (one of Defendant's Current Health Problems is listed as "Hyp chr kidney disease w stage 5 chr kidney disease *or ESRD*") (emphasis added, emphases in original omitted).

[6] "Generally, the higher the number [eGFR], the better your kidney function." *Health Library: Diagnostics & Testing: Estimated Glomerular Filtration Rate (eGFR)*, Cleveland Clinic, https://my.clevelandclinic.org/health/diagnostics/21593-estimated-glomerular-filtration-rate-egfr (last visited Jan. 23, 2025).

hyperparathyroidism (Dkt. No. 99, p. 117),[7] which Defendant asserts requires surgery; a rash around her dialysis port site (catheter), as Defendant has chronic contact dermatitis (a skin allergy) (Dkt. No. 99, pp. 26-27, 118, 465, 495-96); and at least twice having staphylococcus epidermidis (infections in her blood) (Dkt. No. 99, pp. 5, 10, 20, 176, 178, 180, 182, 188, 190, 192, 194, 220, 222, 230).

Defendant argues her medical conditions fall within the updated definition of "extraordinary and compelling" in the U.S. Sentencing Commission's Policy Statement, made effective November 1, 2023.  She argues her ESRD constitutes a "terminal illness" ("end-stage organ disease") under §1B1.13(b)(1)(A),[8] and/or that

---

[7] "Hyperparathyroidism is when your parathyroid glands create high amounts of parathyroid hormone in the bloodstream.  These glands, located behind the thyroid at the bottom of your neck, are about the size of a grain of rice. The parathyroid hormone produced by the thyroid glands helps maintain the right balance of calcium in the bloodstream and in tissues that depend on calcium for proper functioning.  This is especially important for nerve and muscle function, as well as bone health... Secondary hyperparathyroidism occurs due to another disease that first causes low calcium levels in the body.  Over time, increased parathyroid hormone levels occur as the body fights to keep the calcium level up in the standard range.  This is common in kidney disease and after certain intestinal surgeries or diseases." *Diseases & Conditions: Hyperparathyroidism*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/hyperparathyroidism/symptoms-causes/syc-20356194 (last visited Jan. 23, 2025).

[8] Guideline § 1B1.13(b)(1)(A) provides that an "extraordinary and compelling" reason for compassionate release includes medical conditions of a defendant, such as when defendant is "is suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end-of-life trajectory)."  A probability of death within a specific timeframe is not required.  Examples of terminal illnesses include "metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), *end-stage organ disease*, and advanced dementia" (emphasis added).

her ESRD in conjunction with her other medical conditions qualify under § 1B1.13(b)(1)(B)(i).[9]

District courts have regularly found that ESRD is an "end-stage organ disease" under Guideline § 1B1.13 or that ESRD, in combination with other medical conditions, otherwise qualifies as an extraordinary and compelling reason for early release. *See*, *e.g.*, *United States v. Merriweather*, 15-cr-40046-JPG, 2024 U.S. Dist. LEXIS 171630, *11 (S.D. Ill. Sept. 23, 2024); *United States v. Burke*, CR 21-0655 JB, 2024 U.S. Dist. LEXIS 146445, *62-69 (D.N.M. Aug. 15, 2024); *United States v. Salley*, 19-688, 2023 U.S. Dist. LEXIS 22351, *10-12 (E.D. Pa. Feb. 9, 2023); *United States v. Solorio*, 3:11-cr-138-TJC-LLL-3, 2022 U.S. Dist. LEXIS 180930, *4 (M.D. Fl. Oct. 3, 2022); *but see United States v. Hawkins*, 7:14-cr-00020, 2023 U.S. Dist. LEXIS 109073, *7-13 (W.D. Va. June 23, 2023) (defendant's diagnosis with ESRD did not constitute an extraordinary and compelling reason for his early release because defendant was adjusting well after a kidney transplant and nothing in his medical records suggested he was not receiving appropriate treatment).

Considering Defendant's serious medical conditions, and particularly her ESRD, the Court hereby finds that Defendant has presented extraordinary and compelling reasons for compassionate release. However, the inquiry does not end there, and the Court must consider the factors under 18 U.S.C. § 3553(a).

---

[9] Guideline § 1B1.13(b)(1)(B)(i) provides that "[t]he defendant is suffering from a serious physical or medical condition that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover."

9

## II.     18 U.S.C. § 3553(a) Factors

"[E]xtraordinary and compelling reasons are necessary—but not sufficient—for a defendant to obtain relief under § 3582(c)(1)(A) …a district court must also consider 'the factors set forth in section 3553(a)' before granting relief." *Jones*, 17 F.4th at 374.  Stated differently, "[i]f a defendant establishes…the existence of extraordinary and compelling circumstances, then the Court must also consider all the Section 3553(a) factors to the extent they are applicable, and may deny such a motion if, in its discretion, compassionate release is not warranted because Section 3553(a) factors override, in any particular case, what would otherwise be extraordinary and compelling circumstances." *United States v. Johnson*, 92-CR-159-A, 2024 U.S. Dist. LEXIS 59810, *12 (W.D.N.Y. Apr. 1, 2024) (internal quotation marks and citation omitted).

While it is apparent that the function of Defendant's kidneys has deteriorated since December 2020, and although there is no dispute that she has been diagnosed with some serious health conditions, the question remains whether Defendant's ESRD and other medical conditions are being monitored by the BOP and whether she is receiving appropriate treatment for them.  "Ultimately, the goal of compassionate release for medical circumstances is to allow inmates to seek the care they require outside the BOP to improve their condition in a way that the BOP is incapable of offering, or alternatively, allowing inmates the comfort of spending their final moments outside prison." *United States v. Alexander*, 19-cr-40085-JPG, 2024 U.S. Dist. LEXIS 183077, *11 (S.D. Ill. Oct. 7, 2024).

Defendant does not argue the BOP is improperly treating or failing to adequately monitor her ESRD.  Defendant receives dialysis three days per week, which as relayed to the Government by Dr. Timothy Bollinger from FMC Carswell,[10] is standard treatment for her current medical needs.  Moreover, Defendant's medical records evince that she is receiving treatment for her medical conditions at FMC Carswell.  She has suffered infections, but those have been diagnosed and treated with antibiotics.  Defendant also has the option of utilizing a "permanent access point (arteriovenous fistula or arteriovenous graft)" to facilitate dialysis, which would lower her risk of infection—but Defendant has refused to discuss this option with a vascular surgeon, resulting in a catheter to facilitate dialysis, instead.  With respect to Defendant's high blood pressure, the BOP has been treating this condition with medications and monitoring it when it remains elevated.[11]  As to Defendant's concerns about surgery to address her secondary hyperparathyroidism, FMC

---

[10] This information is included in Exhibit A to the Government's response papers (*see* Dkt. No. 107, pp. 13-14), which is simply the copy of a letter from the AUSA who spoke with Dr. Bollinger at FMC Carswell and memorialized their discussion, and which Dr. Bollinger apparently reviewed and signed.  In her reply papers, Defendant has not contested the accuracy of the Government's representations in said letter or raised the issue that this information is not sworn to.

[11] *See*, *e.g.*, Dkt. No. 99, pp. 84, 118 (noting Defendant's blood pressure remained elevated "although she is on 4 medication[s] for BP," and it would be "monitored by Nephrology"), 131-32, 140 ("Pt. has extremely high blood pressure if she does not take her BP meds every 8 hours"), 144, 516 (noting blood pressure checks were to be done on "non-dialysis days," and provider would be notified if blood pressure was higher than 179/119), 543, 553-54, 854 (at an appointment with an outside cardiologist, noting "[s]ince [Defendant was] last seen, her blood pressure has been recently controlled"; "[t]he only time she reports it being elevated is right before dialysis"; and "[s]he has had her blood pressure checked on non-dialysis days in the mornings after she had already taken her a.m. meds, and her blood pressures have been normal").

Carswell has followed the standard treatment strategy for that condition: Defendant's surgery has been approved, and the BOP is now attempting to schedule the surgery with an ear, nose, and throat doctor (ENT).

As far as the Court can tell from this record, Defendant's medical conditions have been adequately treated and monitored in the BOP. The BOP is also providing specialized care, per the Court's sentencing recommendation. See *Merriweather*, 2024 U.S. Dist. LEXIS 171630, at *11-13 (finding the § 3553(a) factors required defendant to serve more of his sentence as the Court considered the same health conditions at sentencing, and defendant was able to commit his criminal offenses even in his fragile health condition); *Burke*, 2024 U.S. Dist. LEXIS 146445, at *76-85 (finding the 3553(a) factors served as an independent bar to a reduction of defendant's sentence); *Salley*, 2023 U.S. Dist. LEXIS 22351, at *12-16 (denying the motion when considering the 3553(a) factors, including defendant having served only about 16 months out of his 90-month sentence, at a federal medical center where he was "afforded the highest-level medical treatment in federal facilities"); *Solorio*, 2022 U.S. Dist. LEXIS 180930, at *5-6 (finding the § 3553(a) factors did not support a sentence reduction because, among other reasons, defendant's conditions were being treated and monitored by a federal medical center and he received routine kidney dialysis).

In addition, the Court was well-aware of Defendant's health conditions at the time of sentencing.

In sentencing Defendant to 88 months' imprisonment, at the low end of the Guidelines, the Court considered Defendant's poor quality of life stemming from her

12

multiple medical conditions.  The Court also ruminated, however, over Defendant's atrocious offense conduct that had a substantial impact on the victims. Defendant took advantage of vulnerable individuals and used their information for her personal gain.  The victims faced considerable hardships due to Defendant's actions, after they had already been experiencing significant stress in their lives from surviving natural disasters.  As elucidated in the victim impact statements, victims spent months attempting to mitigate complications related to their PII caused by Defendant's criminal conduct.

The gravity of the offense conduct remains unchanged.  Furthermore, Defendant's medical conditions did not deter her from committing these crimes, and the Court cannot ignore that Defendant has been federally charged for additional alleged criminal acts after she was indicted in this case.  In addition, Defendant's pretrial supervision was challenging, with the Court receiving multiple violation reports from Probation citing Defendant's noncompliance.  *See* Dkt. No. 87, ¶¶ 17-21.  Defendant's projected release date is approximately 28 months from now.

Even though the Court has concluded extraordinary and compelling circumstances exist, the § 3553(a) factors presently continue to outweigh them.  Thus, no reduction in sentence is warranted and Defendant will serve the balance of her sentence to achieve the purposes of her sentencing, as long as the BOP can care for her medical needs.  This denial is without prejudice to renewal, should Defendant's circumstances regarding a viable donor (who has been medically cleared as a match) and facilitation of treatment by the BOP change.

## **CONCLUSION**

For the foregoing reasons, Defendant's motion for compassionate release (Dkt. No. 95) under 18 U.S.C. § 3582(c)(1)(A) is DENIED.

**IT IS SO ORDERED.**

            *s/Richard J. Arcara*
            HONORABLE RICHARD J. ARCARA
            UNITED STATES DISTRICT COURT

Dated:  January 23, 2025
    Buffalo, New York